**UNITED STATES, Appellee,**

v.

**Steven M. LAMPANI, Senior Airman, U. S. Air Force, Appellant.**

No. 41294/AF.
ACM 22877.

U. S. Court of Military Appeals.

Aug. 30, 1982.

For Appellee: *Captain Michael J. Hoover* (argued); *Colonel James P. Porter* (on brief).

For Appellant: *Captain Neil S. Richman,* USAFR (argued); *Colonel George R. Stevens, Captain Willard K. Lockwood* (on brief).

*Opinion of the Court*

EVERETT, Chief Judge:

A general court-martial composed of officers tried appellant at Bergstrom Air Force Base, Texas, on four charges arising from the larceny of a motorcycle. Two original charges—one for conspiracy to steal the motorcycle and the other for the theft, *see* Articles 81 and 121 of the Uniform Code of Military Justice, 10 U.S.C. §§ 881 and 921, respectively—were based on the premise that he conspired with Airman First Class Hofmeister to steal the 1979 Yamaha of another airman and then had stolen it him-

self. The two additional charges alleged that appellant had been an accessory after the fact to the larceny "by receiving and storing said motorcycle at his residence, by aiding in the disassembly of said motorcycle, and by aiding in the disposal of said motorcycle," in violation of Article 78, UCMJ, 10 U.S.C. § 878, and that he "did . . . unlawfully receive and conceal" the motorcycle, which "he . . . then well knew, had been stolen," in violation of Article 134, UCMJ, 10 U.S.C. § 934.[1]

■ As the military judge properly instructed the court members, the additional charges were an alternative to the original charges. Therefore, if the court members found appellant guilty as an accessory or receiver, he could not be convicted of the conspiracy or larceny, and, of course, vice versa. See United States v. Cartwright, 13 M.J. 174 (C.M.A.1982). Thus, consistent with the instructions, the court members acquitted appellant of conspiracy and larceny, but convicted him as an accessory and receiver. He was then sentenced to a bad-conduct discharge, confinement at hard labor and forfeiture of $300.00 pay per month for 18 months and reduction to E–1. The convening authority reduced the period of confinement and forfeitures to 12 months, but otherwise approved the findings and sentence. Thereafter, the United States Air Force Court of Military Review, having concluded that military jurisdiction existed as to the two offenses of which appellant was convicted, affirmed the findings and sentence. United States v. Lampani, 11 M.J. 632 (A.F.C.M.R.1981).

We granted review of this issue:

WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION BY DENYING THE COURT'S REQUEST FOR AN ADDITIONAL WITNESS.

I

According to a stipulation of fact, a 1979 Yamaha valued at about $1800.00 was stolen from its owner, Airman First Class Warren, on or about June 13, 1979. The motorcycle engine, as well as the frame and miscellaneous parts of the motorcycle, were presented as prosecution exhibits.

Airman Basic Charles Hofmeister, the key prosecution witness, testified that in April 1979, he had "copied the serial numbers off the ignition switch on a motorcycle on base located by the Bare Base Dining Hall." With this information he was then able to have a key made for that motorcycle. His purpose was to steal the motorcycle in order to obtain parts for his own motorcycle—which was of the same model.

Around May 28, he and appellant agreed "that . . . [Lampani] would steal the bike for me if I would pay for the parts." The plan was for appellant and a civilian nicknamed "Zombie," with whom Lampani lived off-base, to go on the base, steal the motorcycle, take it to appellant's house, and disassemble it. With the information and key provided by Hofmeister, the plan was effectuated successfully in June. Thereafter, Hofmeister bought some exhaust pipes from appellant for $60.00 and attached them to his own motorcycle. Later Lampani agreed to sell Hofmeister the engine for $200.00, and Hofmeister picked it up at appellant's house and made a partial payment of $50.00.

Subsequently, Hofmeister and his wife had an argument; when she threatened to turn him in to the local police, he warned appellant to dispose of the motorcycle frame and parts still located at Lampani's house. Shortly thereafter, Hofmeister, "Zombie," appellant and Don Keith dumped the motorcycle frame and parts into a nearby lake. Later Hofmeister was arrested by the local sheriff's department and he made various statements, in one of which he implicated appellant.

Mrs. Hofmeister testified about her husband's purchase of the motorcycle engine from Lampani and the $50.00 part payment on the price; she corroborated her husband's testimony on some other matters. Senior Airman Corry testified that "Zombie" had been disassembling a motorcycle at

---

1. For sentencing purposes the judge treated the two additional charges as multiplicious.

appellant's house. Special Agent Aldridge of the Office of Special Investigations (OSI) described the recovery of the motorcycle frame and parts from the lake pursuant to information provided by Hofmeister.

The Government also offered into evidence, without defense objection, an "affidavit" executed by appellant which gave a very different version of events. According to that document, Lampani had "known . . . Hofmeister since the summer of 1978," and "considered" him a friend. The affidavit also recited:

> Sometime in May of 1979, Hofmeister told me that he wanted to get a new engine for a used motorcycle that he had recently bought. He told me that he would be showing up at my house, 3315 Terrell Lane, in Travis County, Texas, with another motorcycle in order to change engines. Since he was already working there on his car, I did not object. On some date in the middle of June 1979, someone drove a Yamaha, 650 Special, motorcycle to my house and parked it in my driveway. The next day at work, Hofmeister approached me and asked if I had seen the bike. I said yes. Hofmeister then stated that "it was easy." He then told me that he had gotten the bike from in front of the barracks near the chow hall. He stated that the owner was on leave. He told me that the guy (owner) would get paid for it since he had financed it through the Bergstrom AFB Credit Union and it had to have been insured. He then stated that he copied the number off of the ignition lock and had gone to Sharp's Locksmith and got a key made for the bike. He said he started up the bike and drove it out the main gate to my house where he left it.
>
> Over the next couple of days, Hofmeister came to my home and disassembled the bike that he had parked at my house. Due to the way that Hofmeister often referred to the bike, I am sure that the bike that he took from on base was the same one that he disassembled at my home. Besides the used bike that he had previously bought, this was the only other motorcycle that he brought to my house.
>
> I did not assist Hofmeister in disassembling the motorcycle. I was aware that the engine on his used bike was "shot" and had to be replaced. While I did not see him exchange motors, he did tell me that he had put the engine from the motorcycle that he had taken from on base and put it on his frame. I subsequently saw him drive his motorcycle with the newer engine on base as he used this bike as his means of transportation to and from work.
>
> About ten days to two weeks after he had brought the bike to my house, I saw him with a small hand grinder and a set of number dyes that he had checked out from the tool crib at work. He told me that he was going to take the numbers off of the engine, which he later confirmed. He told me that I should refer anyone who wanted parts from a 650 Yamaha to him.
>
> I have never stolen a XS–650 Yamaha motorcycle from Bergstrom AFB, TX. I did not sell a motorcycle motor to Hofmeister for $200.

The defense offered no evidence on the merits.

After hearing final arguments, receiving instructions, and deliberating for slightly more than an hour, the court reopened and the following colloquy occurred:

MJ: Mr. President, I understand that the court has a question it would like to have resolved.

PRES: Yes. We need a definition, one, again, of reasonable doubt. Two, we need a question answered which is, can you be guilty of an overt act and not be present at the scene of that particular act?

MJ: Are those the two questions that the court has?

PRES: There's one more that I would like to ask you and that is, is it possible to question a witness at this particular point?

MJ: No, because all the witnesses have been excused, and you've heard argument of counsel and instructions. In

order to hear a witness, you'd have to open that all up again, have reargument, reinstructions, and that type of thing.

PRES: Okay.

The military judge then discussed "reasonable doubt" at some length and, in response to an inquiry from a court member, he noted that the members could weigh the evidence in light of their own common sense and knowledge of human nature. After a brief recess, the judge responded in the affirmative to a question from the court whether an accused may be guilty of an overt act—in this instance, larceny—and not be present at the scene of the overt act. The president of the court-martial then asked the military judge to discuss an element of the conspiracy charge and this was followed by a related question from a court member. Further questions by the court members as to conspiracy and the liability for ensuing overt acts were followed by a suggestion on the part of appellant's individual defense counsel that the judge might have misinterpreted a member's question. After a brief colloquy between the judge and the court member with respect to that question, the court resumed its deliberations. Slightly more than a half an hour later, the verdict of guilty was returned.

## II

Appellant contends that although the court had already closed for deliberations, its members had the right to call for additional evidence. The language of paragraph 54*b* of the Manual for Courts-Martial, United States, 1969 (Revised edition), supports that position, for it contains no limitation on the right conferred upon court members to "take appropriate action with a view to obtaining available additional evidence." [2]

■ Moreover, our precedents make clear that, even after the court members have begun their deliberations, they may seek additional evidence. *United States v. Parker*, 7 U.S.C.M.A. 182, 21 C.M.R. 308 (1956); *United States v. Turkali*, 6 U.S.C.M.A. 340, 20 C.M.R. 56 (1955). In *Parker*, the court members had been deliberating less than an hour when the accused moved for a finding of not guilty and the court reopened to explain that it wished to receive some additional information. The motion for a finding of not guilty was denied and two government witnesses were recalled at the request of the trial counsel. In upholding this procedure, our Court noted that the Manual "fails to spell out with particularity at what point in the trial" the court members may ask that additional evidence be presented and we observed:

> A practical time that the court-martial is in a position to determine the sufficiency of the evidence is when the case is finally presented to it for deliberation as to the guilt or innocence of the accused.

*Id.* at 184, 21 C.M.R. at 310.

■ The opinion relied on *Turkali* where, "after the court had deliberated on the findings for approximately ten hours, it reopened and requested that two material witnesses—who had not previously testified—be called." *Id.* As additional authority, we cited civilian cases which allowed a jury to request additional evidence in the discretion of the trial judge, even after it had retired to deliberate on the findings. Furthermore, we observed that Colonel Winthrop had

---

2. The language of this Manual provision is:
   *b. Responsibility of the court.* The court is not obliged to content itself with the evidence adduced by the parties. When that evidence appears to be insufficient for a proper determination of the matter before it or when not satisfied that it has received all available admissible evidence on an issue before it, the court may take appropriate action with a view to obtaining available additional evidence. The court may, for instance, require the trial counsel to recall a witness, to

summon a new witness, or to make an investigation or inquiry along certain lines with a view to discovering and producing additional evidence. In doing so, however, the court must be careful not to depart from an impartial role. The right of the members to cause the recall of a witness or to call for additional evidence is subject to an interlocutory ruling by the military judge or the president of a special court-martial without a military judge as to the propriety thereof.

announced that a court-martial "may permit a case once closed on the part of a prosecution or defense, or on both sides, to be reopened for the introduction of testimony previously omitted or discovered since closing," and if the court "desires to hear certain evidence not introduced by either party, it may properly call upon the judge advocate to procure the same if practicable, adjourning for a reasonable period to allow time for the purpose." *Id.* at 185, 21 C.M.R. at 311.[3] Accordingly, the court members were at liberty to request that witnesses be called or recalled or to have testimony reread by the court reporter even though they had commenced their deliberations. Hence, to the extent that the military judge indicated to the contrary, he was wrong.

The Government argues that a military judge has discretion to determine whether a witness is called or some additional investigation is performed. We agree that the right of the court members to obtain additional evidence is not absolute. Difficulty in obtaining witnesses and concomitant delay; the materiality of the testimony that a witness could produce; the likelihood that the testimony sought might be subject to a claim of privilege; and the objections of the parties to reopening the evidence are among the factors the trial judge must consider. However, clearly a military judge cannot exercise his discretion in an informed manner without obtaining some indication from the court members as to the witnesses whom they desire to call. Of course, in eliciting such an indication, the judge walks a tightrope because he must seek to assure that the court members do not inadvertently reveal any of their findings. Nonetheless, in the present case the judge should have gone further than he did and should not have summarily answered in the negative the court's question about the possibility of questioning a witness.

Furthermore, the judge's negative response was based on an erroneous premise. Merely because a witness has been excused does not exempt him from recall and if the identity of the requested witness was ascertained, it might be quite simple to obtain his presence. Also, hearing additional testimony from a witness would not necessarily require "reargument, reinstructions, and that type of thing." In this regard, the judge would have considerable discretion, which, of course, would be guided by the nature and scope of the additional evidence presented.

### III

Although the military judge erred in his answer to the question by the president of the court-martial about calling a witness, we are convinced that no prejudice resulted. In the first place, when we examine the extensive discussion after the court had reopened for further instructions, it is evident that the members were focusing on the first two charges—larceny and conspiracy. Therefore, appellant certainly could not have been prejudiced by the judge's error as to those charges, on which he was acquitted.

Second, the manner in which the president posed his inquiry and in which the judge responded thereto suggests that the court members were concerned with recalling one of the four government witnesses who had testified. Their testimony related chiefly to the first two charges, while as to the two additional charges—the charges of which Lampani was convicted—the Government was relying almost exclusively on his "affidavit."

As the judge had already made clear to the court members, appellant could not be called by them as a witness. In view of the witnesses who were reasonably available to testify,[4] it clearly appears that the testimo-

---

**3.** Mil.R.Evid. 614(a), which had not taken effect at the time of appellant's court-martial, is perfectly consistent with this procedure.

**4.** Special Agent Aldridge testified that he had not been able to locate "Zombie," who presum-

ably was unavailable. Don Keith, who helped dispose of the frame and parts in the lake, could have added little—if he was available to testify.

ny that could have been elicited would have only eliminated the conspiracy and larceny charges. Thus, its sole relevance to the charges of which appellant was convicted is that the testimony of such a witness might have persuaded the court members to find appellant guilty of conspiracy and larceny and thereby necessarily to acquit him of being a receiver and accessory after the fact. In view of the respective seriousness of conspiracy and larceny on the one hand and the two additional charges on the other, as evidenced by the respective maximum punishments imposable—[5] appellant cannot complain of this outcome.

We observe that although the defense was alert to correct the military judge as to the import of a question posed by a court member, there was no defense objection to the judge's erroneous advice that additional evidence could not be received nor did defense counsel seek to ascertain who might be desired by the court as a witness. While we do not equate this silence with a waiver of appellant's right to have the court correctly instructed by the judge, we infer that—consistent with his entire strategy during the trial—the defense counsel was relying on weaknesses in the prosecution's case. No defense evidence had been offered during the trial and apparently the defense counsel did not wish the court members to have an opportunity to hear additional evidence that might fill gaps in the Government's evidence on the conspiracy and larceny charges.[6] Whether defense counsel realized that the judge had erred in his advice about calling a witness, he obviously perceived that this advice had not

prejudiced his client and we reach the same conclusion.

### IV

Although the military judge erred in his response to the question by the court as to the possibility of calling a witness, this error did not prejudice appellant under the circumstances of this case. Accordingly, the decision of the United States Air Force Court of Military Review is affirmed.

Judge FLETCHER concurs.

COOK, Judge (concurring in part and dissenting in part):

I am not convinced that the witness sought by the court members would necessarily have been one of the four government witnesses who previously testified or that the testimony would have related to the charges of which appellant was acquitted. Nevertheless, I agree with my Brothers that appellant's failure to object to the military judge's misadvice was "consistent with his entire strategy during the trial," i.e., that of "relying on weaknesses in the prosecution's case." 14 M.J. 22, 27. Under these circumstances, I have no hesitancy in holding that appellant has failed to preserve the issue for appeal. *Cf. United States v. Head*, 6 M.J. 840 (N.C.M.R.1979); *United States v. Brumbaugh*, 6 M.J. 672 (A.C.M.R.1978), *pet. denied*, 6 M.J. 290 (C.M.A.1979); *United States v. Wolff*, 5 M.J. 923 (N.C.M.R.1978), *pet. denied*, 6 M.J. 305 (C.M.A.1979); *United States v. Anderson*, 1 M.J. 688 (N.C.M.R.1975).

---

**5.** *See* Table of Maximum Punishments, para. 127c, Manual for Courts-Martial, United States, 1969 (Revised edition).

**6.** The wisdom of this defense strategy was vindicated by the findings of not guilty on the two more serious charges despite eye-witness testimony by Hofmeister. Moreover, on the two

additional charges, which involved offenses committed off-base, appellant had available a colorable contention that military jurisdiction was lacking. Although this claim was rejected at trial and by the Court of Military Review, and we declined review thereof, the defense strategy was logical.