# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

————————————

No. ACM 39529

————————————

## UNITED STATES
*Appellee*

v.

## Alan L. LEIBY
Master Sergeant (E-7), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 12 February 2020

————————————

*Military Judge:* Donald R. Eller, Jr.

*Approved sentence:* Dishonorable discharge, confinement for 2 years, and reduction to E-1. Sentence adjudged 26 April 2018 by GCM convened at Tyndall Air Force Base, Florida.

*For Appellant:* Major Mark J. Schwartz, USAF; Major Dustin J. Weisman, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Lieutenant Colonel G. Matt Osborn, USAF; Major Anne M. Delmare, USAF; Mary Ellen Payne, Esquire.

Before MINK, LEWIS, and D. JOHNSON, *Appellate Military Judges.*

Judge LEWIS delivered the opinion of the court, in which Senior Judge MINK and Judge D. JOHNSON joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

LEWIS, Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of one specification of sexual assault of Ms. AT, in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[1] The court members sentenced Appellant to a dishonorable discharge, confinement for two years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority disapproved the adjudged forfeitures and waived the mandatory forfeitures for a period of six months, or until release from confinement or expiration of term of service. The convening authority directed the mandatory forfeitures be paid to Appellant's wife, KL, for the benefit of her and their dependent children. The convening authority approved the remainder of the adjudged sentence.[2]

Appellant raised three assignments of error: (1) his conviction is legally and factually insufficient; (2) the military judge erred when he did not permit the court members to recall witnesses; and (3) his trial defense counsel were ineffective by not eliciting testimony or offering evidence during findings regarding the severity and extent of KL's depression.[3]

On the third issue, Appellant claims that if the members heard evidence of the severity and extent of KL's depression, they "would likely have found" that Appellant and AT had consensual sex and that Appellant's statements in two

---

[1] All references in this opinion to the Uniform Code of Military Justice (UCMJ), the Rules for Courts-Martial (R.C.M.), and the Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.).

[2] Trial defense counsel's clemency letter requested the convening authority "disapprove any period of confinement exceeding 18 months." The addendum to the staff judge advocate's recommendation (SJAR) did not address the defense counsel's misstatement of the law regarding the convening authority's power to disapprove confinement. *See United States v. Zegarrundo*, 77 M.J. 612 (A.F. Ct. Crim. App. 2018), *rev. denied*, ___ M.J. ___, No. 19–0407, 2019 CAAF LEXIS 741 (C.A.A.F. 8 Oct. 2019). We note the SJAR itself correctly stated that the convening authority had no power to disapprove any of the adjudged confinement. *See* Article 60(c)(2)(A), (c)(4)(A), UCMJ, 10 U.S.C. § 860(c)(3)(B), (c)(4)(A). We find no colorable showing of possible prejudice from trial defense counsel's misstatement of the law as it incorrectly informed the convening authority he had more, rather than less, discretion than he actually had. *See United States v. Lamica*, No. ACM 39423, 2019 CCA LEXIS 257, at *16 n.4 (A.F. Ct. Crim. App. 14 Jun. 2019) (unpub. op.), *rev. denied*, ___ M.J. ___, No. 19–0410, 2019 CAAF LEXIS 765 (C.A.A.F. 22 Oct. 2019); *United States v. Ten Eyck*, No. ACM 39188, 2018 CCA Lexis 193, *6–8 (A.F. Ct. Crim. App. 17 Apr. 2018) (unpub. op.), *rev. denied*, 78 M.J. 56 (C.A.A.F. 2018).

[3] Appellant asserts the third issue personally in accordance with *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

recorded pretext phone calls with AT "only demonstrate [Appellant's] desperate attempt to save his marriage and protect his wife's friendship with AT." Appellant's sworn declaration to support this assignment of error says, "I stupidly would have probably admitted to shooting JFK during those days if I thought it would help my wife." After considering the evidence on this matter, including Appellant's testimony during findings, we find this issue warrants no further discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

We address the first two assignments of error below. We find no prejudicial error and affirm the findings and sentence.

## I. BACKGROUND

Appellant, his civilian wife, KL, and their two children lived off-base in Panama City, Florida. KL was close friends with AT and for a time both women worked at a local store. In the six months prior to the incident, AT often stayed overnight at Appellant's house. When she stayed overnight, AT usually slept on a sectional couch in the living room.

Appellant and AT had similar loud personalities and the two "got along" well. Appellant, KL, and AT often engaged in sarcastic, sexual banter and spoke openly about sexual topics. On at least one occasion in the past, AT gave Appellant a lap dance. During the lap dance, both Appellant and AT were wearing clothes and others were present. AT recalled that she "lap danced everybody" that was there, not just Appellant. On another occasion in the past, AT slept in Appellant's bed with KL in between AT and Appellant.

On 25 November 2016, the day after Thanksgiving—commonly known as Black Friday—AT went shopping and to dinner with her mother and stepfather. AT then drove to the home of Appellant and KL. When AT arrived Appellant, KL, and their two children were home. A military spouse neighbor and her two children were visiting. AT had children as well, but her children were not present as they stayed with their grandfather after Thanksgiving.

That night, all the adults were drinking alcohol. AT consumed two mixed drinks that Appellant made and took one shot. AT's demeanor was loud and boisterous and she said "let's go party" to everyone. The neighbor remembered seeing AT sitting in Appellant's lap, face-to-face, with her legs around his hips. KL remembered seeing AT sitting on Appellant's lap, but thought AT had her back to Appellant. At trial KL was asked whether it was odd for AT to sit on Appellant's lap in which she replied, "that is how she is with us. So I guess I took it as a joke." At some point, AT picked out a change of clothes because she knew she was going to stay the night. She selected a pair of leggings that belonged to KL and wore one of Appellant's t-shirts.

Throughout the evening, AT spent a significant amount of time on the phone with her boyfriend trying to convince him to come to Appellant's house. AT's boyfriend could not visit as he had his children with him and lived 50–60 miles away. Later, as a joke, either Appellant or KL took AT's phone and threw it in the backyard so AT would stop talking to her boyfriend. AT responded by retrieving her phone and then going in the bathroom and lying down on the bathroom floor and continuing to talk to her boyfriend. AT remembered being "too drunk to drive," but not falling over. Eventually, KL went to the bathroom and assisted AT to the couch. Appellant went to his bathroom to throw up and then went to his bedroom to sleep. KL joined Appellant in bed leaving AT on the couch still on the phone with her boyfriend. About an hour later, KL heard her daughter wake up and went to her daughter's room to sleep with her.

In the middle of the night, Appellant awoke and realized that KL was not in bed with him. He left the bedroom and located KL asleep in his daughter's room. When he returned from his daughter's room, Appellant saw AT on the couch and approached her.

AT testified to "waking up to [Appellant] having sex" with her on the couch. At first, AT was confused and did not understand what was happening. For a few seconds, AT thought it might have been her boyfriend as her eyes were still closed. As she woke up, AT realized it could not be her boyfriend because he never came to Appellant's house. AT felt pressure on her chest. As AT began to wake up, in the dim light, she saw Appellant. Startled, AT said, "what the hell, Al." She pushed Appellant's hand off her chest. At this point, AT was on her back with her feet up and knees pushed toward her. The leggings that AT was wearing were still on, but were down around her ankles. AT also kicked her feet "a little bit" to push Appellant's shoulders off her legs. Appellant got up, pulled his pants up, walked into his bedroom and said nothing.

Appellant testified to a different version of the events. Appellant recalled waking up in his bedroom and going to check on his wife, who was sleeping in his daughter's bedroom. Appellant stated he did not see AT the first time he walked by the couch, but she was awake when he walked by the couch the second time. According to Appellant, the two briefly exchanged commentary on AT's boyfriend, then AT rubbed Appellant's crotch with her cell phone, which "slightly surprised" him. He took the phone out of AT's hand and she then stroked his penis with her hand underneath his boxers. Appellant leaned forward, touched AT between her legs and kissed her. AT pulled one or both of her legs out of her leggings, Appellant got on top of AT, and the two started having "quiet sex." Appellant testified that while the two had sex, AT stated, "do you feel me squirting all over your d**k" and Appellant felt a "warm sensation from [his] chest all the way down" which "absolutely shocked" Appellant.

Appellant believes he "pulled out" and then AT said, "what the f**k, Al." Appellant said he stood up and walked off "covered in whatever that was."

After Appellant walked away, AT remembered lying on the couch and trying to process what happened. She decided to leave and made what she described as a "terrifying" drive home because she was "very intoxicated." AT made it home to her townhouse and went to sleep.

At 0446 hours on Saturday, 26 November 2016, KL texted AT asking whether AT drove home. KL used the words "crazy" and "[y]ou better be ok" in her text. AT replied, "Yes I'm home." At 0859 hours, KL texted AT asking her to call when she was up. KL and AT talked on the phone twice Saturday morning. In the first call, AT told KL that she had a nightmare and a "really bad feeling" so she just wanted to go home. After the first call, AT went to the bathroom to take ibuprofen for her headache. As she sat there, AT leaned forward onto her chest and felt soreness. At that moment, AT realized that the assault from Appellant was "real" and she decided that she needed to tell KL. AT called KL a second time and asked her to come over.

Before KL could arrive at AT's home, Appellant called AT. Appellant had overheard KL and AT talking on the phone and was "trying to figure out what is happening" and was "processing things." Appellant decided to call AT on the phone. Appellant told AT "sorry for f***ing you" and asked her to not tell KL. When KL arrived, AT recalled telling her that she "woke up to [Appellant] having sex" with her. KL was "shocked" and "very upset" but could not stay long as she had to go to work. AT went back to bed after KL's visit.

At 1257 hours on Saturday, Appellant texted AT. He wrote "Hey it's [A]l. I am so sorry about everything I hope I can sit down and talk with you. Can we meet somewhere or something? I have the kids with me." AT responded, "I appreciate that [A]l. I'm not ready yet." Appellant responded to AT, "[y]ou are a great person and don't deserve this. None of this is anywhere near your fault. I am truly sorry." AT responded, "[t]hank you."

For the remainder of Saturday, AT went to the mall to purchase a gift for her boyfriend as his birthday was that weekend, had a "terribly awkward" dinner with KL, and then went to a club with her boyfriend. On Sunday, AT and her boyfriend went to a movie, had lunch, and visited KL at the store where she worked. On Sunday night, as AT went to pick up her children, AT had an emotional breakdown. AT pulled her vehicle over and called her mother. Crying hysterically, AT told her mother that KL's husband raped her. AT's mother told AT to come to her house. When AT arrived she was pale with swollen eyes. AT's mother called the Bay County Sheriff's Office (BCSO) in Florida and reported the crime.

At trial, AT described her activities after the assault and why she had the emotional breakdown. AT testified she had been "attempting to ignore" what happened with Appellant but got a "reality check" as she thought about putting back on "the mom hat" while driving to pick up her children.

On Monday, 28 November 2016, BCSO recorded a pretext phone call between Appellant and AT. By Wednesday, 30 November 2016, agents from the Air Force Office of Special Investigations (AFOSI) took over the investigation and recorded a second pretext phone call between Appellant and AT. We discuss the content of the recorded calls when we address the legal and factual sufficiency assignment of error below.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Additional Background

Appellant asserts his conviction is legally and factually insufficient because the evidence demonstrates that AT consented or Appellant honestly and reasonably believed that AT consented. According to Appellant, AT's version of the events is implausible, defies common sense, and is unsupported by the evidence. He argues that what really occurred was regrettable, consensual sex. Appellant urges us to view his comments during the pretext phone calls as attempts to preserve his relationship with KL and their children. Appellant raises six grounds to challenge AT's credibility: (1) AT minimized her flirtation with Appellant; (2) AT denied fighting with her boyfriend on the phone; (3) AT's testimony about her alcohol use is inconsistent and contradictory; (4) AT lied to KL when she disclosed the alleged assault; (5) AT lied to her mother when she reported; and (6) AT lied about having a bruise on her chest.

The Government responds that the conviction is legally and factually sufficient and emphasizes five points for our review. First, the Government presents ten examples where AT's testimony on the events leading up to the incident are corroborated by other witnesses. Second, the Government offers 18 examples from the pretext phone calls where Appellant corroborates AT's testimony. Third, the Government lists six examples from the incident or its aftermath, including prior consistent statements of AT, that corroborate her testimony. Fourth, the Government challenges Appellant's assertion that AT's story is implausible and points to Appellant's responses in the pretext calls to show Appellant believed AT's version of the events. Fifth, the Government asserts that Appellant's trial testimony presented a "newfound and uncorroborated" version that was difficult for the members to believe.

After reviewing the evidence presented to the members, we find the convictions legally and factually sufficient.

**2. Law**

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citation omitted); *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

In Appellant's case, based on the charge sheet, the elements of sexual assault in violation of Article 120, UCMJ, included the following: (1) that at the time and place alleged, Appellant committed a sexual act upon AT, to wit: penetrating her vulva with his penis; (2) that Appellant did so by causing bodily harm to AT, to wit: penetrating her vulva with his penis; and (3) that Appellant did so without the consent of AT. *See Manual for Courts-Martial, United States* (2016 ed.), pt. IV, ¶ 45.b.(3)(b). In this case, "sexual act" means contact between the penis and vulva and for purposes of this paragraph contact involving the penis occurs upon penetration, however slight. Article 120(g)(1)(A), UCMJ, 10 U.S.C. § 920(g)(1)(A). "Bodily harm" means any offensive touching of another, however slight, including any nonconsensual sexual act. Article 120(g)(3), UCMJ, 10 U.S.C. § 920(g)(3). "Consent" means a freely given agreement to the conduct at issue by a competent person. Article 120(g)(8)(A), UCMJ, 10 U.S.C. § 920(g)(8)(A). An expression of lack of consent through words or conduct

means there is no consent. *Id.* "A sleeping, unconscious, or incompetent person cannot consent." Article 120(g)(8)(B), UCMJ, 10 U.S.C. § 920(g)(8)(B).

### 3. Analysis

It is undisputed that Appellant penetrated AT's vulva with his penis at the time and place alleged. The Government also had to prove beyond a reasonable doubt: (1) the penetration caused bodily harm to AT; (2) AT did not consent; and (3) the defense of mistake of fact did not apply because Appellant did not have an honest and reasonable mistake of fact that AT consented.

Our analysis focuses first on the two recorded pretext phone calls between Appellant and AT. We find the major difficulty with believing Appellant's trial testimony is that it was diametrically opposed to what he told AT during two recorded pretext phone calls. We also address a member's question to Appellant about the content of the recorded calls that we find important. We conclude by addressing what a reasonable factfinder could have found at trial and the six challenges that Appellant raises on AT's credibility on appeal.

#### a. First Recorded Call – Monday, 28 November 2016

In the first recorded call, Appellant initially professed that he did not "really have any clue" what happened. He remembered "doing it a little bit" while thinking he was having sex with KL but also thinking "it was not her at the same time." AT immediately told Appellant, "I just woke up to you having sex with me." She questioned, "how did my pants get off" and stated, "I just don't understand this." Appellant's response included, "I am right there with you. I never would ever think about doing that to anyone . . . especially not you." AT asked, "is there anything that you remember" and Appellant replied, "I really don't remember getting up, I don't remember going anywhere, I don't remember if we talked, I don't remember anything."

AT then asked Appellant about the phone call he made to her on Saturday, the day after the incident. The following discussion ensued:

> [AT]: I mean you called me and said, "I'm sorry I f\*\*\*ed you" and now you are saying you don't remember, so I am very confused.

> [Appellant]: After [KL] was talking to you on the phone . . . that's when it all came back to me and I'm like "I did do that, didn't I?" And I thought the same thing, I kind of thought it was like a dream or something like that or I was just confused and then after we were done talking I was like yeah I definitely did do that didn't I? Oh s\*\*t. You know? It was one of those like what the f\*\*k, you know? Like, I don't know. I did not wake up with the idea to do that by any means. I didn't wake up with any idea, I just I don't know.

After Appellant and AT discussed how AT's chest could have become bruised, AT said, "the fact of the matter is, you still had sex with me without me wanting to." Appellant replied, "I know and I mean that is the best I can say or do about it I don't know. It's ridiculous to say that I didn't know what the hell was going on."

The conversation continued:

> [Appellant]: I just thought I would call you and tell you that I'm extremely sorry. I'm extremely embarrassed and I don't know, I don't even, I haven't slept that much at all and I have not eaten much at all since then, I don't really know. I feel like a different person. I feel like a person that you know like I talk about the bad guy all the time, because that's how I feel. I don't know. I feel like the type of person that I would like to kick their a** if I was, you know my normal self. But I just don't.
>
> [AT]: Alright.
>
> [Appellant]: Just know that I didn't mean anything by it, I don't know. I just tried to kind of own up to it instead of not. Drinking too much is an excuse and thinking that you know it was [KL] is a stupider excuse and I don't know. It['s] just I have nothing, it's like it feels like somebody else did it and I have to answer for it. And I know it's not somebody else. Like I said, I've had people you know, roommates, people sleep over all the time, and nothing like this has ever happened. I mean I'm sorry for you, you did not deserve it, you did not do anything. I know I turned you into a victim and it sucks.

After discussing whether Appellant made mixed drinks for AT that night, the following exchange occurred:

> [Appellant]: I want to talk to you more often, okay? I'm sure you don't want to talk to me, but I don't know. If it makes you feel better to know at least if you want to we can talk about it.
>
> [AT]: Ok.
>
> [Appellant]: I don't really have much I can say, but all I can say is, wow, what the f**k? I didn't mean anything by it at all by that. I didn't go after you. I didn't try to do anything like that.
>
> [AT]: Ok.
>
> [Appellant]: So, I'm sorry I was trying to comprehend this myself and . . . and I'm like "what the f**k, Al?" And, I know you feel

9

bad and horrible which sucks, I don't know. I feel like a complete f***ing piece of s**t and I should.

### *b. Second Recorded Call – Wednesday, 30 November 2016*

Appellant and AT exchanged text messages about when they would next talk on the phone. Two days after the first recorded call with BCSO, AT called Appellant and AFOSI recorded this call. At the beginning of the conversation, Appellant asserts that he did not put anything in AT's drink to drug her. The following exchange then took place:

[Appellant]: . . . You were saying something about you being unconscious, but that's one part that I do remember, is that basically you said something and that's kind of when we both realized what was going on I guess. Yeah, that little bit I remember.

[AT]: When we both realized?

[Appellant]: I mean when—

[AT]: You knew I would never consent to that. I would never be okay with that.

[Appellant]: I am not saying by any means that you started it or that you wanted it or anything like that. I don't want to come across like that. I'm not saying that by any means.

[AT]: It really sounds like that, it really sounds like you are saying that I was okay with it.

[Appellant]: No, that's absolutely 100 percent not what I'm trying to say. I am trying to say that the little bit that I do remember, you were not unconscious. So I wasn't attacking a passed out body type thing but I am not trying to say at all that you wanted it or you were willing or you invited it or anything like that. I don't want to make it sound like that because that's not it at all.

[AT]: Okay, so if I was not unconscious, but I was not willing, that really does not make any sense to me honestly, Al. At first I was confused but now I'm sort of pissed off. Because I would never, even drunk or not, I would never even think of doing that to my best friend, especially not in those types of circumstances.

[Appellant]: That's the reason that I did not say anything about that before is because I did not want to at all make it sound like anyway that you wanted it, because you did not want this. I'm sure. I was on the couch on top of you, . . . you did not pull me out and pull me on top, I'm sure. So it only had to have been me

10

who did this stupid s**t. But that is all I'm saying, is I don't want to make it seem like I drugged you or something like that. I don't even know how to drug anybody, you know? I just didn't want to make it seem like I am one of those stalky people type thing or something like that.

After some discussion about the stress AT was under, whether Appellant was minimizing what he did, and the level of AT's drunkenness that night, AT asked Appellant, "what do you remember?" He replied,

[t]he only bit that I remember is you said something and then right then I knew it wasn't [KL] once you said something. And I kind of stopped and then you kind of stopped and then that's all I remember of that. I am assuming that I got up and left. You told me to leave or something, I don't remember. But the little bit that I remember is you were saying something to me that shook me awake, I guess . . . . It's not like I saw a dead body on the couch and I just did it I don't think. That's all I'm saying. Don't take that as me saying [that] you were into it. You weren't. I'm sure you weren't, I am sure you were not all there.

Later, the following discussion occurred:

[AT]: Do you see why I am angry? Do you—

[Appellant]: —I mean I am totally with you. I don't want to say the word mistake, like it was a mistake. Because I am sure part of it was not a mistake, I don't know. I am not trying to minimize it in any way. I'm just trying to talk to you about it, you know? I am just trying to tell you that is the only bit that I remember, I did not want to tell it to you because I did not want to make it seem like I was trying to say "oh you were down" or "you were into it" or whatever. . . . I don't want to make it seem like that. I know you did not ask for it I am sure and you didn't do anything so.

[AT]: Well.

[Appellant]. You are the victim, 100 percent.

The two continued their conversation by discussing the possibility of pregnancy and revisiting whether Appellant remembered how AT's pants could have come off and how her chest could have become bruised. At the end of their conversation, came this exchange:

[Appellant]: I'm just trying to say again that I'm not trying to shift the blame off of you, it is 100 percent me. Please do not take

this in anyway as me saying "oh you were involved or whatever" because you weren't.

[AT]: Ok. How is [KL]?

[Appellant]: Good, I mean I guess. She has been quiet. I really don't know what to say to her. She is depressed like she was before back in the day. I deserve what I get.

### c. Member's question about recorded calls

Three members had questions for Appellant during his testimony. One of those questions focused on the content of the recorded calls.

[Military Judge]: During the course of the recorded calls, why do you take full responsibility? You never indicate "we" or "we did this" or anything like that. It is very singular to you, very "I am responsible. It is my fault." Help the members understand why you would capture [it] that way?

[Appellant]: I've wondered that as well. I have heard this call many times and I thought the same in my head. I think part of it goes back I guess [to] working on the flight line. If there is something that you were involved with that went wrong, you just kind of own it and you jump on it and you say I did it. In this case a lot of it was I did not want to trigger [AT] any more than necessary really. My ultimate goal was to try and repair their friendship somehow and I thought that was the best way to do that would be to fall on my sword and take the blame for everything. The thought of sexual assault never crossed my mind the entire phone call. You could even hear it when I say things like "you weren't unconscious, but you weren't willing or whatever." That makes no sense but my mindset or my thought of rape or sexual assault never occurred to me. Looking back on it, I feel very stupid about that.

### d. Appellant's defense at trial and challenges on appeal

Appellant's defense at trial, that he maintains on appeal, was that he was now telling the truth in his testimony and he had lied to AT in the pretext phone calls about his memory and what happened. He asked the members to believe that AT was the instigator, that she was fully awake and aware, that she took off the leggings herself, and actively participated in sexual intercourse with him. The abrupt stop to the intercourse was now caused because a shocked Appellant felt a warm sensation from AT on his chest all the way down to his groin. In this version, Appellant remembered everything that occurred.

A rational factfinder could have determined that large portions of Appellant's trial testimony were false and the more reliable evidence came from the two recorded phone calls with AT, the text messages Appellant sent to AT, and the trial testimony and prior consistent statements of AT. The court members could have reasonably concluded that Appellant knowingly penetrated AT's vulva with his penis while AT was not "all there." In the light most favorable to the Government, the members could have found the penetration constituted "bodily harm" because it was a nonconsensual sexual act. Similarly, the members could have found AT did not freely agree to be penetrated by Appellant because in the words of Appellant it was "100 percent" him, AT was "not into it," and AT was the "victim."

Turning to Appellant's challenges to AT's credibility, the court members could have found that even if the challenges raised by Appellant to AT's credibility were true, they did not affect the evidence that proved the elements of the offense beyond a reasonable doubt.

Appellant's first challenge involved AT minimizing or denying that she flirted with Appellant. Even if AT did not accurately testify to the nature of her flirtation with Appellant earlier in the night and in the past, the court members could still reasonably believe that she was penetrated by Appellant without her consent because she woke up to Appellant already having sex with her. There was ample evidence to support such a conclusion including Appellant's second recorded call where he denied that AT "started it" or "wanted it." If the members believed Appellant's statements in the second recorded phone call over his trial testimony, how much or how little AT flirted with Appellant in the past would not be important to whether the Government proved the elements beyond a reasonable doubt.

Appellant's second challenge is that AT denied fighting on the phone with her boyfriend, a fact contradicted by other witnesses. The members could have reasonably resolved the characterization of AT "fighting" with her boyfriend as a matter of semantics based on the perceptions of different witnesses. AT admitted that she is "a loud person," and that it was "very possible" that she "raised [her] voice" and called her boyfriend "names in a playing way" on the phone. The members could reasonably have found the distinction between a "fight" and what AT testified she did irrelevant.

Appellant's third challenge is that AT's testimony about her alcohol consumption was inconsistent and contradictory. AT remembered having two mixed drinks and one shot but could not remember if she finished her second mixed drink. AT denied drinking before arrival and denied drinking a "drink that was not [hers]." According to Appellant, AT "claimed she was intoxicated in order to make it seem like she did not actively participate in the sexual encounter." In Appellant's view, "AT was not heavily intoxicated; rather she was

conscious and aware of what she and [Appellant] were doing . . . ." We are uncertain how the evidence that AT may have drank more alcohol before arriving and consumed another's drink supports Appellant's argument regarding her inflating her level of intoxication. Regardless, the Government did not need to prove that AT was intoxicated, highly or not, to prove the elements of the offense. A reasonable factfinder could conclude that AT's testimony on her alcohol consumption and its effects simply was AT's best recollection of what occurred and any differences with other witnesses were not important to whether the Government proved the elements of the offense.

Appellant's fourth challenge is that AT lied to KL immediately following the incident. This conversation occurred at AT's house when KL came over on Saturday at AT's request. AT testified that she told KL that she "woke up to [Appellant] having sex with [her]." KL testified that AT reported "they had sex" and that AT never mentioned that Appellant raped or assaulted her. KL did testify that AT thought it was her boyfriend, then she realized it was Appellant. KL also testified that AT told her "I don't think [Appellant] did it intentionally to hurt you" and that AT kept saying she was "freaking out." KL testified she was "mainly mad" at Appellant and not AT after learning what happened.

Appellant argues "nothing that AT told KL conveyed that the sexual encounter was nonconsensual." We interpret KL's testimony about what AT told her as more nuanced. KL recalled AT using the words "they had sex" when describing what happened. Such a description, if actually given by AT, would imply a consensual sexual encounter between Appellant and AT. However, AT did not recall this part of the conversation the same way as KL. AT remembered telling KL she "woke up to" Appellant having sex with her, which indicates a lack of consent by AT. This difference in their testimony does not mean AT lied to KL. AT never testified that she used words like rape or assault with KL which is consistent with KL's recollection. KL also made clear that AT did not realize it was Appellant at first, an important point on whether AT freely agreed to have sex Appellant. The members also knew that KL was "especially" mad at Appellant for some reason. On the whole, a rational factfinder could have believed that KL missed some of the nuance of AT's disclosure, given the alarming content of what KL was being told. The members reasonably could have believed that AT did not lie at all to KL but just used a vaguer description when she told KL what happened.

Appellant's fifth challenge is that AT lied to her mother to make it seem like she was a victim instead of a willing participant. AT's mother testified that AT told her that Appellant met AT with a drink upon arrival while AT testified she "asked" Appellant for a drink. On the other hand, AT testified that Appellant did bring her a drink later. A reasonable factfinder could have determined

the contradiction between Appellant bringing AT a drink upon arrival or later was unimportant to whether the Government proved the elements beyond a reasonable doubt.

AT's mother also testified about what AT did after the incident. AT's mother recalled AT telling her that AT was so upset the day after the incident that AT "stayed in bed on Saturday." Both AT and KL testified to the contrary. First, KL came to AT's house on Saturday and they were "sitting outside" when they first discussed what happened between AT and Appellant. Second, the two women had an "awkward" dinner together on Saturday night. Finally, after dinner, AT went out to a club with her boyfriend. While a reasonable factfinder would understand the contradictions Appellant identifies, they could still determine that the Government proved the elements of the offense even if AT failed to tell her mother more precisely how much time she stayed in bed on Saturday.

Appellant's sixth and final challenge is that AT "lied about having a bruise on her chest to make it seem more believable that the sexual encounter was nonconsensual." Appellant notes that trial counsel offered no evidence to corroborate AT's claim that she ever had a bruise and did not mention it in closing argument. We are limited in our legal and factual sufficiency review to the evidence produced at trial for the members. *See Dykes*, 38 M.J. at 272. Therefore, we decline Appellant's invitation to speculate whether Appellant's mother or anyone in law enforcement photographed AT's chest area and what such photographs would or would not show.

In looking at the evidence actually presented, we note the members heard AT testify that Appellant put "pressure" on her chest with his hand during the incident and that she "felt soreness" on her chest the next day. In both recorded pretext phone calls, both Appellant and AT discuss the issue of bruising and how it occurred. Appellant asserted "[t]here is no way" that he was holding AT down. A reasonable factfinder could have concluded that AT's chest was bruised or at least sore afterwards because Appellant put his hand on her chest and that AT's statements during the pretexts calls and in her testimony were not lies.

Appellant concludes by claiming that AT's story is "incredible" and to believe it requires us to set aside "common sense." He asserts that AT had a powerful motive to lie to preserve her relationship with KL. Appellant argues he was pressured by AT during the recorded pretext phone calls and AT did have "some limited success" in getting him to "apologize." Appellant states he apologized because he "just did whatever [he] could to really try to save [his] marriage because their friendship with [AT] was super important to [KL]." A rational factfinder could have considered the nature of Appellant's apologies and found the explanation he gave in his trial testimony unconvincing. Appellant's

own words, tone, and demeanor in the pretext phone calls were powerful evidence for the Government. The members could have reasonably concluded that the recordings and the texts from Appellant show a concerted effort to placate AT so she would not further report what he did to her. Appellant claimed in his trial testimony that rape or sexual assault did not cross his mind while he was on the phone with AT, but he is the one who admitted that he "turned [AT] into a victim and it sucks" in the first recorded call and told AT she was "the victim, 100 percent" in the second recorded call. The court members did not need to be certain of all the reasons Appellant attempted to do damage control with AT in the days after the incident to determine the Government proved the elements of the offense beyond a reasonable doubt.

In the assignment of error, Appellant briefly mentions the mistake of fact defense. He offers no additional argument or analysis beyond the citations to Rule for Courts-Martial (R.C.M.) 916(b) and (j). The military judge properly instructed the court members on the defense of mistake of fact and its two elements: (1) that the mistake must have existed in Appellant's mind; and (2) the mistake must have been reasonable under all the circumstances. The military judge provided several definitions to the court members including: (1) "[t]o be reasonable, the . . . mistake must have been based on information, or lack of it, that would indicate to a reasonable person that the other person consented;" and (2) the "mistake cannot be based on the negligent failure to discover true facts."

Even if a reasonable factfinder found Appellant was honestly under a mistaken belief that AT consented, the court members could have reasonably found the Government proved beyond a reasonable doubt that such a belief was unreasonable under all the circumstances. The court members had ample evidence on this point from the recorded calls. Appellant admitted to AT that she "was not all there." He explained to AT, "I am not trying to say at all that you wanted it or you were willing or you invited it or anything like that." These statements alone, which a reasonable factfinder could believe were true, would be sufficient for the Government to prove the defense did not apply beyond a reasonable doubt.

Drawing "every reasonable inference from the evidence of record in favor of the prosecution," the evidence was legally sufficient to support Appellant's conviction of sexual assault of AT beyond a reasonable doubt. *Barner*, 56 M.J. at 134 (citations omitted). Moreover, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses as the court members did, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325. We are also convinced beyond a reasonable doubt that the Government proved the defense of honest

and reasonable mistake of fact did not apply to Appellant. Appellant's conviction for sexual assault is both legally and factually sufficient.

## B. Court Member Questions

### 1. Additional Background

At the conclusion of the findings evidence, the military judge released the court members with instructions to return at 0800 hours the next day. The military judge instructed the members "[y]ou are nowhere near time to talk about the case because you don't know what the law is . . . I will give you the law tomorrow morning."

After the overnight recess, the military judge began giving instructions to the court members on the order of events regarding instructions and arguments by counsel. Following this introduction, the president of the court, Lieutenant Colonel (Lt Col) MB, and the military judge had the following exchange:

> [Lt Col MB]: After last night, kind of thinking about it, we had questions of the witnesses that we did not ask yesterday. Having seen everything that has been presented, we do have some questions.
>
> [Military Judge]: Okay. Well to the extent that the witnesses were held subject to recall. It is exactly for that purpose. You will have the ability to recall witnesses and seek out additional evidence. What I am going to do is tell you this, let's work through the instructions and then let's work through the arguments. Because it has been my experience that sometimes the members after having now reflected on "okay this was all the evidence, I wonder about this?" It may be a nonissue for you once I give you the law. On the other hand, as the five of you sit back because you have not deliberated yet, you [have] not discussed it, other people's perspectives may [change to] "oh that is not as big a deal as it was in my mind when I was driving in." You all can start your deliberations and suddenly [decide] "we do want to recall. We want to hear from [a witness]." Absolutely possible. What I would ask you to do is write out your question. Everything, sir [Lt Col MB], should come under your signature, this way I don't [go] into any particular insight into what Lieutenant [DG] is thinking or what Captain [HW], or what you are thinking. Everything comes under your signature. So it is just sort of an anonymity of this is what the panel is interested in. If that happens, let the bailiff know because there is a twofold process to this.
>
> First off, I have an obligation to work with the parties to determine if that evidence is reasonably available.

> Second, is that is it admissible under the rules of evidence? . . . So you send [the question(s)] in advance, I can work with the attorneys and figure out if there is an answer and we can get the witness recalled, bring you back in and pose the questions to them and send you back in to deliberate.

> So you absolutely do have the ability to seek out additional evidence. I would just suggest maybe you wait and after you all talk about it, maybe it is not a big deal and now that I am telling you what the law is and what your focus should be you say "yeah you know what, I don't really care what kind of tires were on the car." Hyperbole, a simple example.

> So you do have that ability. Any other questions? Not at this time.

After instructions and arguments were complete, the military judge reminded the court members:

> [a]gain if during the course of your deliberations you have additional questions, comments, or concerns write them down. Everything will come out under your signature [Lt Col MB] and then just give it to the bailiff and he will be somewhere near one of these doors. It will then give us a head start on anything that we are trying to find additional information for you.

Soon after, the military judge asked the court president, "At this point any questions or are you ready to start?" Lt Col MB replied "We are ready to start." The court closed for findings deliberations.

During deliberations, the members did not write out any questions or identify any witnesses to be recalled. The members did ask, through the bailiff, for another laptop so they could listen to the two recorded phone calls between AT and Appellant.

Before us, Appellant asserts the military judge committed plain error by his "constructive denial" of the court members' request to recall witnesses. Appellant explains further: (1) the military judge refused to allow the questioning when it made the most sense, before instructions and closing arguments; (2) the military judge's response had a "chilling effect" on the members and deterred them from requesting witnesses be recalled; and (3) the military judge should have followed up after argument and his failure to do so indicates "he did not wish to allow the members to take additional evidence." Appellant claims he was "severely prejudiced" and notes the members asked no questions of AT or her mother, the only two prosecution witnesses, and that it is "safe to assume AT was among the witnesses" the members wanted recalled. Finally,

Appellant argues that waiver does not apply as the military judge never asked for trial defense counsel's position on this issue.

The Government responds that we need not decide whether Appellant waived this issue because Appellant failed to carry his burden to show plain error. In the Government's view, the military judge never denied the members' request but instead used his discretion and experience to instruct the members that their questions may very well be answered during instructions and the arguments of counsel. The Government argues if the members still had questions afterwards, they were free to ask them. Finally, the Government responds to Appellant's "constructive denial" argument by noting the absence of precedent to support the position. We agree, in part, with the Government's arguments as we conclude Appellant has not met his burden to show plain error.

**2. Law**

We review a military judge's denial of a panel member's request to recall a witness for an abuse of discretion. *United States v. Clifton*, 71 M.J. 489, 491 (C.A.A.F. 2013) (citing *United States v. Carter*, 40 M.J. 102, 104 (C.M.A. 1994)) (other citation omitted). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion." *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000). "The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *Id.* (citation and quotation marks omitted).

However, when an appellant does not raise an objection we first must determine whether the appellant waived or forfeited the objection. *United States v. Jones*, 78 M.J. 37, 44 (C.A.A.F. 2018) (citation omitted). "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *United States v. Ahern*, 76 M.J. 194, 197 (C.A.A.F. 2017) (quoting *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009)). We review forfeited issues for plain error, whereas "a valid waiver leaves no error to correct on appeal." *Id.* (citations omitted). To prevail under a plain error analysis, we "will grant relief in a case of nonconstitutional error only if an appellant can demonstrate that (1) there was error; (2) the error was plain and obvious; and (3) the error materially prejudiced a substantial right of the accused." *Clifton*, 71 M.J. at 491 (citing *United States v. Powell*, 49 M.J. 460, 464–65 (C.A.A.F. 1998)).

Article 46, UCMJ, gives panel members the "opportunity to obtain witnesses and other evidence." 10 U.S.C. § 846. Rule for Courts-Martial (R.C.M.) 801(c) reads in relevant part "[t]he right of the members to have additional evidence obtained is subject to an interlocutory ruling by the military judge." Mil. R. Evid. 614(a) states "when the members wish to call or recall a witness,

19

the military judge must determine whether the testimony would be relevant and not barred by any rule or provision of this Manual." Mil. R. Evid. 614(b) reads in relevant part "[m]embers must submit their questions to the military judge in writing. Following the opportunity for review by both parties, the military judge must rule on the propriety of the questions, and ask the questions in an acceptable form on behalf of the members."

"A military judge may not summarily deny a member's request to recall witnesses for further questioning." *Clifton* 71 M.J. at 491 (citing *United States v. Lampani*, 14 M.J. 22, 26 (C.M.A. 1982)). Rather than summarily approving or denying such a request, before ruling, a military judge must consider other factors such as difficulty in obtaining witnesses and concomitant delay; the materiality of the testimony the witness could produce; the likelihood that the testimony sought might be privileged; and the objections of the parties to reopening the evidence. *See Clifton*, 71 M.J. at 491–92 (citing *Lampani*, 14 M.J. at 26).

### 3. Analysis

We considered whether Appellant waived any challenge to the military judge's approach to the members' request to recall witnesses when trial defense counsel did not object. We decline to find waiver as we do not see an intentional relinquishment or abandonment of a known right from our review of the record of trial. The military judge never asked the parties whether they objected to his decision to postpone member questions until later. Additionally, the military judge did not have the court president identify which witnesses or what proposed questions the members had. We decline to find waiver when Appellant does not know the identity of the proposed witness to be recalled or the subject matter of the proposed questioning. We conclude plain error is the appropriate standard of review as trial defense counsel failed to object prior to the announcement of findings and the military judge never resolved whether the members withdrew their request to recall witnesses after hearing instructions and arguments and conducting their deliberations.[4]

As a threshold question, we find the military judge did not summarily deny any request by the members to recall witnesses for further questioning. During the findings portion of the trial, three of the five court members had questions for witnesses. To address those questions, the military judge asked three of the defense witnesses, including Appellant and KL, a total of 39 questions. While Appellant is concerned that no member questions were asked of the victim, AT,

---

[4] In our view, trial counsel should have requested the military judge confirm with the court president, in open session before the announcement of findings, that no member wanted to recall a witness for further questioning. *See* R.C.M. 913(c) ("ordinarily" the presentation of evidence requested by the members follows rebuttal evidence).

or her mother, the only two prosecution witnesses, we do not share that concern. We also decline to speculate which witnesses the members wanted to recall or the substance of their questions.

Next, Appellant asserts that the military judge constructively denied the members' request to recall witnesses for further questioning. Appellant argues the military judge's response, quoted above, was "tantamount to a denial." The Government asks us to look to the precedent on actual summary denials like *Clifton* and *Lampani* and reject constructive denial as a legal theory. Astutely, the Government also analyzed why the military judge's actions were not tantamount to a denial. This last approach by the Government is the one we find persuasive. Even if a constructive denial doctrine exists in this area of the law, the military judge's actions did not amount to a constructive denial of the members' request. The military judge made clear a request to recall witnesses was "absolutely possible" and the members "will have the ability to recall" witnesses. No reasonable court member would have interpreted the military judge's response as removing their ability to recall witnesses for further questioning. The military judge committed no plain error in his response to the members.

In our view the military judge simply deferred the issue of recall of witnesses for further member questions until after findings instructions, arguments, and the beginning of deliberations. We recognize the military judge's approach was somewhat unorthodox. Other military judges may have immediately had the court member who wanted a witness recalled write down which witness was requested and the proposed line of questioning. Such a practice would allow both parties the opportunity to review and the military judge to rule on the propriety of the questions consistent with Mil. R. Evid. 614(b). The military judge chose a different approach but not one that was a plain and obvious error. Appellant may be correct that it makes "the most sense" to handle the request to recall witnesses immediately, but our standard of review is an abuse of discretion. Even if we have a difference of opinion with the military judge on the best way to approach this issue, the military judge's decision to defer questions to a later point was not arbitrary, fanciful, clearly unreasonable, or clearly erroneous. Indeed, the military judge noted that in his experience the instructions on the law may make the proposed questions a "nonissue."

Appellant also argues the military judge's response that the members' request to recall witnesses for questions may not be approved had a "chilling effect." We disagree. The military judge's instruction on this point simply reminded the members of the earlier procedures used in trial where the questions were written down, shown to the parties, and then asked by the military judge if permissible under the Military Rules of Evidence. The military judge's

description of the process was consistent with Mil R. Evid. 614(b) and no reasonable court member would have found it had a chilling effect on their ability to request a witness be recalled for further questioning.

Finally, Appellant asserts the military judge should have followed up with the court members after argument, and his failure to do so indicates the military judge did not wish to allow the members to take additional evidence. In Appellant's view, the military judge obstructed the members' efforts to ask questions when he should have aided them. In our view, once the military judge chose to defer questions, it would have been preferable from an appellate perspective, for him to follow up before allowing the court president to announce the findings. We believe the military judge could have inquired of the court president on whether the request to recall witnesses was still an outstanding request while simultaneously protecting the members' privileged deliberations. Such a procedure would have likely resolved this assignment of error without appellate litigation. It would also have eliminated any appearance or perception concerns that the military judge acted in a manner inconsistent with the fair administration of military justice. On the other hand, we see no support for Appellant's contentions that the military judge's failure to follow up was some veiled effort to obstruct further member questioning or restrict the taking of additional evidence. Instead, we conclude the members' questions were resolved by the instructions, arguments, and deliberations, and the parties and the military judge decided no follow-up on the record was required under the law. The military judge committed no plain error and find no abuse of discretion on this issue. As we find no plain error by the military judge on how he handled the members' initial request to recall witnesses, we do not reach the question of prejudice.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court